Case No. 225568 John Sawyer v. City of Soddy Daisy TN et al. Argument not to exceed 15 minutes for plaintiff and 15 minutes to be shared by defendants. Mr. James, you may proceed for the appellant. Good morning, Your Honor. May it please the Court, I'm Stewart James. I represent the appellant, John Sawyer, in this matter. I know the Court has read the briefs and understands the facts of this case. And what I wanted to start with was actually the case of Puskis v. Delaware County, Ohio. I believe that Mr. Rader had submitted that case as a recent case decided by the Sixth Circuit on January 5, 2023. And I believe the submission stated that this case was almost exactly on point to the case the Court is considering right now. I don't agree with that assessment because factually I do not think it's factually on point. But I do think the case is very helpful, particularly to the appellant in some respects, because the case does analyze a situation where officers used deadly or used force and the Court found summary judgment in the officer's favor because there was no disputed fact. So first I would like to talk about that as to disputed facts. There are disputed facts in this case as to material issues. And one of the things on the Puskis case that I noted is that the Court at page... I can't quite get the opinion number. The Court decided to the Supreme Court decision of Scott and it says Scott dictates that the video controls. In this case we have video. It's a very detailed video. In fact, we have three videos. We have video from Officer Commiss, which actually outlines the entire facts of what happened in this case when the shooting occurred. We have the video of Officer Jenkins, whose camera actually died and the battery went dead. It's only got the first few minutes of what happened in this case. And then we've got the video of Officer Hindman. In addition to those videos, Your Honors, in response to summary judgment we have depositions and affidavits. And what I would say to the Court that if we are going to look at this case from the standpoint of whether there is a disputed fact saying that the judge was wrong on summary judgment, that the video should be the guiding factor in doing so. And that's what I think I want to use Puskis for because I think that that is very important. Because even though the decision talks about things such as qualified immunity, reasonableness, the circumstances, the totality of the circumstances, I think one of the things that the decision talks about is that there was a video in this case. And the video told them a lot. And one of the points in the case that I thought was very interesting in that case was when an officer's subjective remembrance of what happened in the event contradicted the video, the case indicates to me that you have to go to the video. But the case goes even further than that, Your Honor, and it cites to another case, and if the Court will indulge me, and that is the case also from this jurisdiction, Palma v. Matthew Johns. And that case, I think, is really important because it applies to the analysis in Puskis. But I want to mention one thing before I get into these two cases. And this is the cases that are generally cited in these cases. And that is, officers are generally faced, which I will call an emergency situation. They are generally faced in the cases that I've read, and in both of these cases it's true, where they come up on the individual and the individual and the officer are directly facing one another. What they are doing, Your Honor, is they are in a situation where the officers can interact with that individual. The officers can give commands to that individual. The officer can demand that the individual do A, B, or C. In Puskis, that's exactly what happened. The officers, before the canine dog was ordered to go after Puskis, they had conversations back and forth, and Puskis wasn't cooperative. The same thing in Palma. Palma actually involves a dispute over remote control, just like this case. But the officers saw Mr. Palma. They were able to observe his behavior. They were able to see what he was doing. And Mr. Palma, in that case, also suffered from a mental disability, such as Mr. Sawyer, Jack Sawyer, I should say in this case, Your Honors, who suffered from Alzheimer's. And in every case, even Tennessee v. Garner, all these cases, these officers were able to see and observe what was going on. And arguably, let's set aside the mental disability for a moment, Your Honors. Arguably, if a person had a mental disability, which Palma discusses, there are situations where officers can use deadly force in those situations, particularly if that individual is interacting with the officer and can see that it is a police officer, that the officer is giving commands, and the officer reasonably believes that he is under some threat, or somebody else in the area is under some threat. In Palma and in Puskas, there were other people who could be threatened. In Palma, the woman was threatened with knives and guns. He had guns on his yard. He reached for a gun before the officers actually took corrective action and decided to use force against him. But in that case... Yes, Your Honor. I'm not sure I'm following your argument. Do you agree or disagree that we are constrained to look at what happened immediately before the shooting? See, I disagree with that, Your Honor, because I think that's the argument that the appellees are making. And certainly I think that's what Judge McDonough was doing. Because I think that you have to look at the totality of the circumstances. And if you look at Palma, or you look at Puskas, Your Honor, the district court in that case did exactly the same thing when it granted summary judgment. It looked at the entire events that were happening that led up to the actions that the officer took. In fact, the Puskas case quotes the district court in looking at the totality of the circumstances. I do understand the argument, though, Your Honor, that you look at the immediate incidents that happened right before the shooting. So let me play devil's advocate for a second on that point. In this case, Your Honor, let's assume we are surrounded. We're just going to limit it from the time that the officers got to the bedroom door, opened the bedroom door, went through the hallway that I talk about in my brief, and went into the room. If you take that in and of itself, there still was time, at least seven seconds according to the videos, for the officers to take other actions besides shooting this man. Here's the factors. Seven seconds occurred after they entered one door, went down a short hallway, and entered through another doorway. When they entered through the other doorway, the video clearly shows Mr. Jack Sawyer is sitting on the side of his bed, leaning over, and I believe that Officer Thomas says in his deposition it looked like he was fidgeting with something. Do the officers pause, or do they stop at that point in time, or do they continue forward? Because at that point in time, if you look at the video, the officers' actions are continuous. They never stop. And if you look at that point in time when the officers say, Mr. Sawyer, Mr. Sawyer, drop your weapon. I believe I'm getting that pretty much correct, Your Honor. Officer Thomas is at the foot of Mr. Sawyer's bed. And within a span of one to two seconds, from the first Mr. Sawyer to the time that Officer Jenkins goes to the second Mr. Sawyer after the shooting occurs, Mr. Sawyer is shot. So if we look at it in this context, Your Honor, the officers did have alternatives. They walked into the room, they see Mr. Sawyer sitting on the side of his bed, and I believe that alternative methods and thinking while you're a police officer and using alternative methods is part of the law, Your Honor. They could have stopped at that point in time and just taken a step back. And they could have said, Mr. Sawyer, police. You need to come out with your hands up. Your reply brief says at page two that they never announced their presence. That's correct, Your Honor. Have you viewed Thomas' video, body cam video? Yes, Your Honor, I have. Have you seen 1148 of that video in which it's clearly on the body cam video that they announced their presence? You did not see that on the video? Yes, Your Honor. Now we're talking about announcing presence or announcing whether they're police officers. Well, let's see. They announced, they say police. That's exactly what's on the video. Yes, Your Honor. It's at 1148 on the Thomas body cam video. You say in your brief they never announced. I think I said, and I think I said in my brief, if I may, Your Honor. Sure, I'll read the brief to you if you want. No, Your Honor, I don't think that's necessary, Your Honor, but I think I said in my brief that they never announced police officers while they were sweeping through the house. Despite this knowledge, the officers entered into the Sawyer-Grimm house and after entering went through the home never announcing that they were police. Never announcing. That's incorrect, isn't it? No, it's not, Your Honor, if I may explain. Okay. Your Honor, because what I meant by what I think it says is that after they went into the house, when they were in the house, they never announced they were police. The only time that they did announce that they were police. They announced as they entered the house, right? You concede that. They announced when they opened the door, when they opened the man door. All right. I will concede. All right. You said there are disputes of material fact in this case, and then you say everything is on the video and that we are bound by the video. Well, the video is the video, so what are the genuine issues of material fact? Well, I think there are different ways you can look at the video, Your Honor. Different ways you look at the video? The different facts you take from the video. I think that there are. The turn and point the gun at the officers?  He did turn around. He had a gun in his hand. He had a gun in his hand. He pointed it at the officer. He pointed it at the officer. He pointed it at the camera. I think, Your Honor, I don't think that's correct. Where is he pointing it? He turns around. He pointed it at the floor? Your Honor, I have a slow motion of the video and I have a part of the video. He turns around, and as he turns around, if I may, Your Honor, I don't know if this is good. He turns around, he lifts up, and he turns around in a sweeping motion, and the gun ends up at this point in time when the hand is up in the air at the time of the shooting. I've seen the video. I can see that he's pointed it at the officer, and then the officer shoots him. I mean, I don't think you can redo the video. The video is what it is. It clearly shows me that he points the gun at the officers. Well, Your Honor. Can I ask you a related question? If he points the gun at the officers, do you lose? You know, Your Honor. Well, it's a yes or no. If he points the gun at the officers and the officers have no other alternative, I would say that I would lose. Yes, Your Honor. No other alternative. Yes. They should subject themselves to being killed. The police officer has a constitutional duty to sacrifice himself and not defend himself. I mean, that's quite a high standard, and you want us to. I don't want to, and that's not what I'm saying, Judge. Well, I mean. I mean, it. Go ahead, Your Honor. I'm sorry. Well, I think it's quite, I mean, our case law is quite subtle that the police have a right of self-defense. And once they're reasonably threatened with personal injury, that they have a right to defend themselves and use deadly force. I mean, I think that's clearly the law. And I do agree with what you're saying about the law. But I think also, if you look at Poskus, we're dealing with a situation where these officers were told, and they knew this man had Alzheimer's, that he suffered from an event that was unusual, that was highly out of circumstances. The officers also knew that they were there on a wellness check when they first went into the house. They first decided that they would do or take him into custody in the garage. They entered into the home, Your Honor. After they entered into the home, they swept through the home. When they got to the bedroom door, Your Honor, the bedroom door was closed. They said, Mr. Sawyer, that. We actually have seen the video, so we know. So. I think the point. Yeah, go ahead, Your Honor. I guess I've asked you this before. What is the dispute of fact? How you interpret the video? Is that what you say? Well, that and then there are other. That is the dispute of fact of how the video is interpreted? No, Your Honor. It's more than that, Your Honor. I mean, for example, I'm just going to take one point. The declarations of Eric Jenkins that was filed in response to the summary judgment, as part of the summary judgment motion, where he says that he killed Mr. Sawyer instantly. The video shows that Mr. Sawyer is still moving and he's moaning. I mean, that's a disputed fact, Your Honor. I'm not sure that matters. I mean, okay. All right. You're out of time. You can use your rebuttal, five-minute rebuttal now, or you could use it later. I'll use it later, Your Honor. Okay. Very well. Any further questions at this time, Judge White? All right, Judge. All right. I guess we have three different attorneys, and you've agreed to share your time. Good morning. Good morning, Judge. May it please the Court, my name is Dan Rader. I'm a lawyer from Cookville, Tennessee, and together with my law partner, Elaine Moore, we represent Officer Jenkins and Officer Thomas in regard to this particular matter. And I certainly agree with the question Judge White asked. And this Court has analyzed excessive force, deadly shooting cases with the segmented analysis since the case Livermore v. Llewellyn that was carried forward right to the Peskis case just three weeks ago today on January 5th, 2023. And the question is, from the perspective of the officer, is he perceived a reasonable fear of imminent death or bodily harm? And that's exactly what happened in this case. That was what the Court said in Llewellyn, and the Court followed up in Peskis, that the moment you analyze this as a segmental moment is right immediately before the final shot is fired, and you don't go back in Peskis, for example, to when they released the dog, and they say an earlier Fourth Amendment violation, perhaps, or close issue, can't negate a lawful use of deadly force otherwise. And I believe that's the law, and I believe that's the case. And this question is, when Jack Sawyer pointed the Cock .357 Magnum at Officer Jenkins and Thomas, was it objectively reasonable for him to use deadly force to protect himself? And I think there's no question that that's true. Just last year, Mr. James mentioned Palma. Palma is a radically different case than that, but it's interesting that the judge in that case said that an officer need not face the business end of a gun before he uses deadly force. Well, in this particular case, unfortunately, Officer Jenkins was faced with the business end of the gun and didn't have any time to react. I know Your Honor has watched the video, and I'm not going to recount it, but I do want to kind of go back to the beginning so that everything is really in perspective. The officers came to the home. They did not storm the house. They knocked on the door. They pecked on the window. They tried the cell phone. Didn't get no response at all. Then the owner, Patty Grimm, gave them the key and the garage door opener to go check on Mr. Sawyer and to see about it because he had been so irrational and threatening with her earlier in the evening. And they did enter the door and say, Please, and called his name several times as they went through the house. And this is not a large house. This is not Jed Clampett out in Beverly Hills. This is a small subdivision house in rural Tennessee. And they came into the kitchen, and there was a door. Well, as Judge Griffin said, we've seen the video. Why don't we go to the operative facts? The operative facts are? That he gets up. He's sitting there, and he turns and points the gun. What should the officers have done in that instance? Could they have done something other than shoot him? Because it's pretty quick, right? Turns and points the gun, and boom. If ever there was a situation of a split-second decision, rapidly evolving uncertainty, this is it. They called his name twice, and he didn't say what, who are you, why are you here, which he could have done. In one second, he cocked that .357 Magnum and turned and pointed at the officers, and Officer Gingas had no choice but to shoot. And I think he shot at the same time he was saying drop the gun. There was just no time to do anything. That is the quintessential that over and over again the courts have said, rapidly evolving, uncertain, 20-20 hindsight, split-second decision. That's exactly what happened in this case. And I don't think there's any way else to do it. Mr. James was candid, and I think he's correct. Once Mr. Sawyer pointed that gun at the officer, the officer had a right to use deadly force to defend himself, and Judge McGonagall was correct. Even though the weapon may or may not be loaded, or there may or may not be bullets in the house, that whole thing. The owners, Patty Grimm admitted you'd always treat a gun as loaded. Mr. Sawyer's son admitted that. I always did. Yeah. I mean, we don't need to look any farther than the fellow Alec Baldwin now who shot the lady on the TV set. I mean, every gun should be treated as loaded, and every gun should be presumed loaded, and you don't have to bet your life on the fact that it wasn't loaded. I totally agree with him. So this woman hadn't even seen the gun since July, two and a half months earlier, and the man had been in the house alone. She said the bullets had been taken out of the house, that they were found in the house, and who knows, he might have had other ammunition. So I don't think the officers had any choice. I appreciate Your Honor's time and thoughtfulness, and on behalf of Officer Jenkins and Officer Thomas, we would ask that Judge McGonagall's summary judgment be affirmed. Thank you very much. Make police the court. Brian Bibb from the Knoxville Bar. On behalf of Officer Hyman, I'm going to be very brief. I join fully in the positions Mr. Rader has taken. I want to rise just very briefly to emphasize that all the discussion today has been about the individuals who were in the room. My client was in the home but was in a different part of the home covering a locked door. It was not in a position to arrest any use of force. Mr. James doesn't mention my client at all in his argument today, barely mentions him at all in his briefing. I just want to emphasize that under no circumstances should the grant of summary judgment to Officer Hyman be overturned. What is the theory against your client? I'm not sure, Your Honor. I'll be frank that I'm not sure. To the extent that there is one, I believe we've adequately addressed it in the brief. If the court has any specific questions, happy to raise them. I join fully in the positions that Mr. Rader has made this morning. Thank you. Good morning. Good morning, Your Honors. May it please the court. I will also be very brief. My name is Aaron Wells from the Chattanooga, Tennessee Bar, and I represent the city of Soddy Daisy in this case. I also join wholly in the arguments made by Mr. Rader and Mr. Bibb. The only point that I would like to make this morning is no matter what the court does with the claims against the individual defendants, summary judgment with respect to the claims against the city should stand, and that is because there is absolutely no evidence in the record of any unconstitutional policy, procedure, or custom, nor is there any evidence of deliberate indifference in the record. The plaintiff's claims against the city are premised on a failure to train theory, but, again, there is no evidence of that. The only evidence in the record on that issue, the city's expert's report, as well as a testimony of the officers, established that they were properly certified law enforcement officers in the state of Tennessee and that they were adequately trained. With that, Your Honors, I respectfully ask that summary judgment stand with respect to the claims against the city. Thank you. Thank you. Any further questions? All right. Mr. James, you have rebuttal. Just very briefly, Your Honor, and, Judge, in response to your questions before, I think that we have to look at the totality of the circumstances of the shooting, and I think that's important in evaluating the claim, and I don't think that, as I answered Judge White's question before, that this should be restricted to what happened after these officers. What's your theory against Hinman? I think it's adequately expected in the brief, Your Honor. I mean, I think that what I was trying to say. I was perplexed by it, so explain it to me, because I still haven't figured that one out. I think, Your Honor, the point that we were trying to make in regards to this is that all three officers were acting in concert in the way that they approached this situation. So what, did he conspire with the other two and plant his views in them such that they would do something? I think what they did is what he did not do, and what they all did not do, because they were dealing with a man who had Alzheimer's. And what they were there for, at least according to the 911 tape that I read and what was said early on, is to do a wellness check. And, for example, Your Honor, no officer objected to Officer Jenkins going into the house first without a body camera on. I would love to see what the body camera from Officer Jenkins has, and what his perspective was, because his body camera went dead. That would just be one point. I was trying to look in the brief to address all that, Your Honor. What clearly establishes that Hinman had to do that, that he had to object to Jenkins going in first, and he's subject to liability as a result of everything that happens thereafter. Yeah, I think that's based upon the totality of the circumstances argument that I was making, Your Honor. Thank you very much for your argument.